### In re BROMMER'S WILL.

(Supreme Court, General Term, Second Department. May 14, 1894.)

WILLS—UNDUE INFLUENCE—EVIDENCE.
　　Probate will not be refused on the ground of undue influence, where it appears that testatrix was a fairly intelligent person, and gave instructions intelligently to her counsel, and that he read the will to her, explaining each clause, to which she made intelligent and consistent answers, though it appears that she was somewhat deaf, and not very familiar with the English language.

Appeal from surrogate court, Kings county.

Application for the probate of the will of Magdalena Brommer, deceased. The application was contested by John Paul Hoffman, Frederick C. Hoffman, and Henry D. Bultman, grandsons of decedent. The will was admitted to probate, and contestants appeal. Affirmed.

Argued before BROWN, P. J., and DYKMAN and PRATT, JJ.

Miller & Miller (Jacob F. Miller, of counsel), for appellants.

George F. Martens, for respondents John Brommer and Frederick Brommer.

Thomas J. Farrell, for respondent Helena Hoffman.

Henry D. Van Orden for respondents Rebecca Ridderhoff and others.

PRATT, J. I have been much entertained with the ingenious and admirable presentation of this case by the appellants, but, upon careful reflection, it seems to me that the reasons assigned by the learned surrogate for his conclusion to admit this will to probate are entirely satisfactory. The will is dated and was executed May 8, 1879,—13 years before the death of the testatrix. The proofs show that the draughtsman had been counsel for the husband of the testatrix, and drew his will. He had been counsel for her husband's executors. His professional relations with the family had been continued. It was therefore natural that she should send for this lawyer when she determined to make a will herself. True, he had not seen much of testatrix, herself, after her husband's death; but there is no evidence that she had any occasion to confer with counsel in the mean time, or that she ever even saw any other counsel for any

purpose. It is therefore apparent that no inference of fraud or undue influence should be drawn from the fact that this lawyer was selected. The choice of counsel seems to have been her own. She evidently determined for herself to make a will. When the counsel came to her, she stated the business on hand herself, and gave her own instructions to him. After receiving the same, he made an appointment to call at her house to execute the document, and instructed her that she must provide witnesses for that purpose. When the draughtsman came with the draft, he found that two witnesses were present, evidently chosen and invited by her. It does not appear that she personally requested the attendance of the two witnesses, but one of them (Mr. Bremer) testified that when he arrived the testatrix herself told him that she wanted him "to come as a witness." The other witness (Mr. Ring, since deceased) was present when Mr. Bremer arrived. He was about 62 years of age, and was in good health. Mr. Bremer had formerly lived in the family with testatrix and her husband, and had been a clerk for her husband in his grocery business. After the paper was executed, it was delivered to the draughtsman, who took and kept it for her. She subsequently spoke to others of the fact that she had made a will, evidently referring to this occasion and this paper. It is therefore plain that she began and carried out this business understandingly,—so far, at least, as the matter of making a testamentary disposition of her property was concerned, and selecting natural agencies to carry out her purpose. It also appears that the will was executed with all due formality. She thereafter lived for some 13 years, conscious of the fact that she had made a will; and none of the contestants seem to have raised any question of her capacity, although some of them knew that she had made a will.

The next question relates to her knowledge of the contents of the document. On this point there was rather more than the ordinary amount of proof. The paper was read over to her by the draughtsman, who was one of the witnesses, in the presence of the other two witnesses, whom she had herself selected for that purpose,—Mr. Bremer and Mr. Ring. There is not the slightest suggestion that the document was not fully and fairly read to her. Indeed no motive is suggested for any fraud or imposition in this respect. The only suggestion of want of knowledge of its provisions on her part is predicated upon the allegations—First, that she did not understand the English language; and, secondly, that she was too deaf to understand what was read to her, even if she had been able to understand the language. On the first point,—her alleged ignorance of the language,—there certainly was evidence that she spoke English, and understood the speech of others when they spoke English. True, there were some suggestions in the evidence to the contrary; but it is sufficient to say that there was fair conflict of evidence on this point, and therefore the finding of the learned surrogate ought not to be disturbed. The second point is met by a like condition in the proof. There certainly was evidence that, while this testatrix was hard of hearing, she nevertheless could hear what was said to her when people spoke with their lips from 6 to 12 inches

from her ears, and in fairly loud tones.    One witness, as the result of considerable experience with her, testified that when she spoke in ordinary tones, near to her ears, she seemed to understand better than when she spoke loudly.    She attended to her ordinary duties about the time of the execution of this paper, receiving communica-tions in that way in relation to everyday affairs of life; answering and otherwise acting intelligently.    Mr. Martens, the draughtsman of the will, and Mr. Bremer, the survivor of the two witnesses invited by the testatrix, each testified that the former read over the will, clause by clause, pausing occasionally to make explanations, as he read; that he spoke loudly, with his lips within about 12 inches of her ears; and that her answers were intelligent and consistent. There was therefore sufficient evidence to sustain the findings of the learned surrogate that she heard the contents of the will read, and understood the explanations, and there certainly was no such weighty mass of evidence to the contrary as to justify us in overrul-ing his conclusions on this question of fact.

We thus reduce this case to the simple question whether or not this paper attests such an unnatural disposition of property as, of itself, to indicate undue influence from somebody.    It seems to me that this question is pretty much answered by what has been already said.    This lady was a fairly intelligent person, who knew what she was about; who intelligently gave her own instructions to counsel of her own selection, and there is no question but that they were fair-ly expressed in this document.    It is of no moment that counsel could not, as a mere act of memory, recall the details or substance of the conversation in which the instructions were given, independ-ently of the will itself.    That was not remarkable, after the lapse of 13 to 15 years.    Indeed, it would have been more remarkable if he had undertaken to detail such conversations after such a lapse of time.    He was intrusted with the custody of the document for safe-keeping, and hence there was a special occasion why he should have preserved his memorandum of the original instructions.    Under these circumstances, the paper attests her will; and neither courts nor individuals have a right to speculate upon the reasons why she chose this or rejected that relative as an object of her bounty.    Tak-ing the whole case together, I think the evidence showed that this lady possessed fair testamentary capacity; that she clearly under-stood the contents of this instrument, and freely executed it.    Under these circumstances, we ought not to interfere.    The decree of the surrogate should therefore be affirmed, with costs of the appeal against the adult contestants, but not against the infants.